IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KENNETH R. KENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-1329-KGS |
| | ) | |
| TIMEC COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the court upon defendant's motion for partial summary

judgment (ECF No. 46). Plaintiff asserts defendant unlawfully demoted him and subsequently

constructively discharged him in violation of Age Discrimination in Employment Act (ADEA),

29 U.S.C. § 621, *et seq.* Defendant seeks summary judgment on plaintiff's constructive

discharge claim, arguing that the circumstances leading up to plaintiff's departure were not so

severe and intolerable that plaintiff's only choice was to quit. The court agrees. Remarks about

plaintiff's age, coupled with non-threatening statements about retirement, an alleged

discriminatory demotion, and two instances of criticism during two-and-a-half business days of

"enforced idleness" are not circumstances such that a reasonable jury could conclude defendant

constructively discharged plaintiff. The court also grants defendant's summary judgment motion

as it pertains to the alleged wage loss resulting from the alleged discriminatory demotion.

Plaintiff contends that because his replacement received a pay increase at the time the

replacement assumed plaintiff's position, the difference in plaintiff's salary and his

replacement's post-raise salary represents damages that plaintiff is entitled to recover in the form

of a lost raise. Because plaintiff does not come forward with any evidence suggesting that he

would have been eligible for this raise, the court grants summary judgment as to this claim for damages.

## I.     Legal Standard Governing Summary Judgment Motions

Summary judgment is appropriate if the moving party demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  A "genuine dispute" exists if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[2]  A fact is "material" only if it "might affect the outcome of the suit under the governing law."[3]  The court views the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party.[4]

The movant bears the burden of establishing the lack of any genuine issues of material fact and entitlement to judgment as a matter of law.[5]  To meet this standard, the movant need not negate the claims of the opposing party; instead, the moving party can simply point out the absence of evidence for the opposing party on an essential element of that party's claim.[6]

If the movant carries this initial burden, the nonmovant that bears the burden of persuasion at trial may not simply rest on its pleadings but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could

---

[1] Fed. R. Civ. P. 56(a).

[2] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[3] *Anderson*, 477 U.S. at 248.

[4] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[5] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

[6] *Celotex*, 447 U.S. at 323, 325.

2

find for the nonmovant.[7]  Sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[8] With this standard in mind, the court turns to the facts, which are either uncontroverted or are viewed in a light most favorable to the plaintiff.

## II.    Facts

Plaintiff Kenneth Kent was born in 1945. He began working as a foreman for Defendant TIMEC Company, Inc., in 1999. Mr. Kent was 54 years old at the time.  TIMEC contracts to perform maintenance, repairs, and new construction at oil and gas refineries. In August 2004, TIMEC entered into a contract with the Frontier El Dorado Refining Company to perform maintenance and related services at the El Dorado site. Around that time—in 2003 or 2004—TIMEC promoted Mr. Kent to site supervisor. As site supervisor (also referred to as site manager or site superintendent), Mr. Kent was responsible for overseeing employees at the El Dorado oil refinery. Mr. Kent also oversaw the contract generally and worked with Frontier. TIMEC never disciplined Mr. Kent or counseled him about his work performance. Similarly, Mr. Kent never received a complaint from Frontier about his work performance, and in 2006, TIMEC awarded Mr. Kent a bonus to recognize his performance.

But by late 2007 or early 2008, Frontier's maintenance manager expressed concern about TIMEC's safety record and disappointment with TIMEC's performance. TIMEC's contract with Frontier was set to expire in 2008, and TIMEC was concerned Frontier would decline to renew it. According to TIMEC, but disputed by Mr. Kent,  the management staff in place in 2008 began

---

[7] *Thom*, 353 F.3d at 851 (citing Fed. R. Civ. P. 56(e)).

[8] *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

considering changes spurred by the desire to keep the Frontier contract. By March of 2008, Mr. Kent's direct supervisor was Regional Manager Brad Bolton. Mr. Bolton reported to Vice President Lou Hall, who reported to Chief Operating Officer Gary Green. Mr. Bolton, Mr. Hall, and Mr. Green did not regularly work at the El Dorado site but visited from time to time. According to both parties, in March 2008, these company officials told Mr. Kent that Frontier wanted changes made.

According to Mr. Kent, it was also around this time when these managerial employees began to inquire about his retirement plans and make age-related comments. Mr. Kent testified that in early 2008, Mr. Bolton came into his office and remarked, "You're not retired yet?" Mr. Kent—who was at that time 62 or 63—believed Mr. Bolton was not joking. Mr. Kent also said that sometime before March of 2008, Mr. Green also asked Mr. Kent when he planned to retire. According to Mr. Kent, in March of 2008, shortly after his sixty-third birthday, TIMEC's managerial employees had two meetings with him. During those meetings, Mr. Kent testified that Mr. Green asked Mr. Kent how old he was and when he planned to retire. Mr. Kent also testified that Mr. Hall inquired about Mr. Kent's retirement plans. And, according to Mr. Kent, Mr. Bolton began calling him "the old man," which prompted other TIMEC employees to follow suit—also referring to Mr. Kent as "the old man." Mr. Kent did not lodge any formal complaints regarding the alleged age-related comments.  During these March meetings, Mr. Bolton asked Mr. Kent how he would feel if he was no longer sitting in the site supervisor's chair and TIMEC employee Richard Daw was instead site supervisor.

On April 9, 2008, TIMEC managers met with Frontier representatives. At the meeting, Frontier informed TIMEC that it wanted TIMEC to begin performing some additional

4

services—more planning, capital improvement projects, and "turnarounds," which involved

fixing units of some kind and then turning them over to the client. Around April 25, 2008,

TIMEC submitted to Frontier a proposal for continued work with Frontier. Among other things,

the TIMEC proposal stated that Richard Daw, capital superintendent in charge of capital

improvement projects,[9] would assume the site supervisor position. Mr. Daw was 41 years old. In

May 2008, after learning that Frontier had decided to extend its contract into 2009, Mr. Bolton

told Mr. Kent that there would be a "transition" coming soon. But according to Mr. Kent, Mr.

Bolton did not tell him what the transition would entail.

The record does not establish which employee or employees were responsible for making

the decision to replace Mr. Kent in the site supervisor position. But TIMEC did eventually

decide to remove Mr. Kent from this position. It was at an employee training meeting with 70 to

100 employees on June 17, 2008, when Mr. Kent says he learned for the first time that he would

no longer be site supervisor. Mr. Bolton announced that Mr. Kent was graciously stepping down

and that Mr. Daw would be taking over as site supervisor. Mr. Kent claims he felt humiliated and

embarrassed. After the meeting, Mr. Kent inquired about his new role. Mr. Bolton mentioned

that perhaps Mr. Kent could provide training to other employees. Mr. Kent testified that Mr.

Bolton or Mr. Green told Mr. Kent not to worry about it—that they would think of something for

him to do. According to Mr. Kent, Mr. Green said, "Think of something, Kenny, and we will put

a name on it."

The same day of the meeting, Mr. Daw moved into the site supervisor office, which he

shared with Mr. Kent. Mr. Bolton directed Mr. Kent to sit in a chair across the desk from Mr.

---

[9] Kent Depo at 42:11-15, ECF No. 47-1; TIMEC Employee Status Change Form, ECF 55-10.

Daw and answer Mr. Daw's questions. According to Mr. Kent, he understood that he was to help Mr. Daw "transition into [his] new position and that upper management would look for something for me to do."[10] Mr. Kent testified that during the next two-and-a-half days, Mr. Daw criticized Mr. Kent about his performance as site supervisor. When Mr. Kent asked Mr. Daw if he could help with transition work, Mr. Daw responded in the negative. According to Mr. Kent, apart from answering Mr. Daw's questions, TIMEC provided him with no work to do on these dates—June 18 to June 20. Back in February, Mr. Kent had scheduled vacation from June 23 to June 30. On June 19, Mr. Kent submitted a vacation request form to Mr. Daw, requesting an additional half day off on June 20, the Friday before his scheduled vacation. Mr. Kent testified that he asked for the half day off because he did not "want to go back to work because . . . all I had to do was set [sic] there. And I didn't have no responsibilities, I didn't have anything to do."[11] Mr. Bolton did not know that Mr. Daw had criticized Mr. Kent for the way Mr. Kent handled the Frontier contract, and Mr. Bolton testified that he did not expect Mr. Daw to behave in this manner. While Mr. Kent was on vacation, he says he called Mr. Bolton several times and was pretty sure that he left one voicemail message for Mr. Bolton. But he and Mr. Bolton never spoke during this week.

When Mr. Kent returned to work on June 30, 2008, he spoke with Mr. Daw, who told him that TIMEC still did not have any work for him to perform. At this point, Mr. Kent told Mr. Daw that he was going to retire. On that day, Mr. Kent did not have any conversations with Mr. Bolton or Mr. Hall about his dissatisfaction with his position. Mr. Kent spoke with Mr. Bolton

---

[10] KHRC Compl. at 3, ECF No. 55-7.

[11] Kent Depo. at 96:23-97:5, ECF No. 55-1.

on July 1 and asked Mr. Bolton if TIMEC would characterize his retirement as a reduction in

force so that Mr. Kent could obtain unemployment benefits. Mr. Bolton agreed to do so. Mr.

Bolton also told Mr. Kent that TIMEC could offer him severance pay if he resigned, but Mr.

Kent would not agree to this. Regardless, TIMEC still issued a severance check to Mr. Kent a

few weeks later. At no time did Mr. Kent convey to Mr. Bolton, Mr. Hall, or Mr. Green that he

believed having to work in the same office and sit across from Mr. Daw was humiliating or

embarrassing. Mr. Kent's compensation and benefits remained the same after TIMEC removed

him from the site supervisor position to the time Mr. Kent resigned.

## III.   Analysis

### A.   Constructive Discharge Claim

As the plaintiff in an ADEA case, Mr. Kent bears the initial burden of setting forth a

prima facie case of discrimination before the burden shifts to defendant to articulate a legitimate,

nondiscriminatory reason for its action.[12] For the purpose of the summary judgment motion,

TIMEC contests only one element of the prima facie case. TIMEC argues Mr. Kent did not

suffer an adverse employment action in the form of being constructively discharged.

An employer constructively discharges an employee "when an employer deliberately

makes or allows the employee's working conditions to become so intolerable that the employee

has no other choice but to quit."[13] A plaintiff asserting constructive discharge faces a

"substantial" burden to show that "the working conditions imposed by the employer are not only

---

[12] *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998).

[13] *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005).

tangible or adverse, but intolerable."[14] "If an employee resigns of [his] own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged."[15] The court evaluates the voluntariness of an employee's resignation under an objective standard, considering the totality of the circumstances.[16]

Mr. Kent first argues that TIMEC's regional manager, Mr. Bolton, admitted in his deposition that Mr. Kent was constructively discharged. And Mr. Kent contends that as a managing agent, this testimony is binding on TIMEC. Therefore, TIMEC should not be allowed to contest this point. The deposition transcript, however, does not support Mr. Kent's argument. The portions of the deposition testimony Mr. Kent relies upon reflect that Mr. Bolton believed it would have been degrading and unreasonable if Mr. Kent were required to sit in the same room as his replacement and endure criticism.[17] Mr. Bolton gave these answers after Mr. Kent's counsel rephrased the question several times, to which TIMEC's counsel repeatedly interposed objections, including that the questions involved an imprecise hypothetical, were vague, and called for speculation.  Nevertheless, Mr. Bolton's testimony that the working conditions described by plaintiff's counsel, if true, would be degrading and unreasonable does not establish that Mr. Kent's working conditions were so intolerable that he had no other choice but to quit. Moreover, the employee's or the employer's subjective opinions about the working conditions and intentions are not relevant for the purpose of determining whether an employer has

---

[14] *EEOC v. PVNF, LLC*, 487 F.3d 790, 805 (10th Cir. 2007) (quoting *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270-71 (10th Cir. 2004)).

[15] *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2002) (quoting *Jeffries v. Kansas*, 147 F.3d 1220, 1233 (10th Cir. 1998)).

[16] *MacKenzie*, 414 F.3d at 1280.

[17] Bolton Depo. at 110:14-112:25, ECF No. 55-4.

constructively discharged an employee.[18] Mr. Bolton's testimony does not equate to an admission that TIMEC constructively discharged Mr. Kent.

Mr. Kent next argues that TIMEC prevented him from performing meaningful work and subjected him to humiliating work conditions, all of which effectively left Mr. Kent with no choice except to quit. Mr. Kent cites several cases to support his argument that the working conditions he endured were intolerable. Those cases are factually distinguishable. The duration of the "enforced idleness" was either substantially longer in those cases than what Mr. Kent experienced or the severity of the other working conditions dramatically exceeded those at issue here.

For example, Mr. Kent relies on *Parrett v. City of Connersville, Indiana*,[19] a Seventh Circuit opinion addressing the issue of "enforced idleness" as it pertains to a claim of constructive discharge.  That case involved a former chief of detectives whose employer demoted him to a line-captain position. Although his pay remained the same, he was moved to a windowless office that had formerly been a storage closet. It had a desk and a chair but no other furniture and no phone. The plaintiff was never assigned any work, and after three months of remaining in this position, he was hospitalized with symptoms of nervous collapse. *Parrett* notes that it was not until it had become clear to the plaintiff "that he would not be given any work to do could he be said to have been constructively discharged."[20] The Seventh Circuit affirmed judgment in favor of the plaintiff.

---

[18] *DeWalt v. Meredith Corp.*, 484 F. Supp. 2d 1188, 1199 (D. Kan. 2007), *aff'd*, 288 Fed. App'x 484 (10th Cir. 2008).

[19] 737 F.2d 690 (7th Cir. 1984), *cert. dismissed*, 469 U.S. 1145 (1985).

[20] *Id.* at 695.

Like the plaintiff in *Parrett*, it had also become apparent to the plaintiff in *Poole v. Country Club of Columbus, Inc.*[21] that she was being relieved of all job responsibilities and duties. The Eleventh Circuit opinion notes that the plaintiff was told by her supervisor that her future duties would be "reduced to virtually nothing."[22] Other employees were instructed not to speak to her. She was transferred to the business office with no job duties. She was provided only a chair but no place to store her belongings; they were placed in boxes next to her chair. The Eleventh Circuit held that there were material issues of fact as to whether the employer constructively discharged the plaintiff.

The workplace animus was also pronounced in *Acrey v. American Sheep Industry Association*,[23] a 1992 opinion from the Tenth Circuit. In that case, the plaintiff had come forward with evidence that her supervisor had repeatedly confronted her about alleged performance shortcomings, took away long-standing job responsibilities, and provided her with inadequate information and training to enable her to perform her new job. She also testified that her employer threatened to fire her if she did not quit. She resigned five weeks later. The Tenth Circuit held that there were sufficient facts to allow the jury to decide whether the plaintiff was constructively discharged.

The factual circumstances here are quite different. Mr. Kent experienced two-and-a-half business days of enforced idleness before resigning. There was also a clear indication in *Parrett* and *Poole* that the lack of job responsibilities would be a permanent feature of employment.

---

[21] 129 F.3d 551 (11th Cir. 1997).

[22] *Id.* at 551-52.

[23] 981 F.2d 1569, 1574 (10th Cir. 1992).

Whereas here, there was at least some indiction TIMEC would move Mr. Kent into another position. The plaintiffs in *Poole* and *Acrey* also came forward with evidence that they endured outright hostility. Here, during the brief time when Mr. Kent's responsibility consisted of answering Mr. Daw's questions, Mr. Kent says he endured much criticism from Mr. Daw. But during his deposition, Mr. Kent was only able to describe two instances of criticism.

According to Mr. Kent, Mr. Daw picked up a contract he was reading, looked directly at Mr. Kent, and told Mr. Kent that he should have been charging for something contained in the contract.[24] Mr. Kent said that Mr. Daw further stated, "Kenny, you should have never let it go like that. We're going to run this like a business from now on, not like you run it."[25] Mr. Kent recalled another instance when Mr. Daw was speaking on the phone in front of him. Mr. Daw relayed to the person on the phone that he was in charge now and that "we're going to run her the best way—I mean, we're going to run her like it's supposed to be run."[26] It is arguable whether this statement even amounts to a criticism of Mr. Kent. Moreover, when asked if he could recall any other criticisms, Mr. Kent answered that he could not.[27] These events are not analogous to what the plaintiffs in *Poole* and *Acrey* endured.

Even considering the alleged age-related comments made by TIMEC managerial-level employees and given that both parties agree there are material issues of fact as to whether TIMEC demoted Mr. Kent in violation of the ADEA, these are still not sufficient circumstances

---

[24] Kent Depo. at 90:19-22, ECF No. 47-1.

[25] *Id.*

[26] *Id.* at 91:1-4.

[27] *Id.* at 91:5-7.

for a rational trier of fact to conclude TIMEC constructively discharged Mr. Kent. Showing that

an employer committed a tangible employment action or an adverse employment action "is not

necessarily sufficient to establish constructive discharge because a constructive discharge

requires a showing that the working conditions imposed by the employer are not only tangible or

adverse, but intolerable."[28]  A "finding of constructive discharge may not be based solely on a

discriminatory act; there must also be aggravating factors that make staying on the job

intolerable."[29]  Notably, Mr. Kent does not bring a hostile-work-environment claim, as is often

the case when an employee alleges his employer constructively discharged him.[30] Here, the

alleged age-related comments and discussions about retirement from TIMEC managerial-level

employees seem to be mostly isolated to the meetings that occurred with Mr. Kent in March of

2008. The record contains only vague references to other age-related comments, such as Mr.

Bolton and employees at the El Dorado site referring to Mr. Kent as "the old man." These

remarks about Mr. Kent's age and discussions regarding retirement that did not appear to be

threatening or harassing are insufficient to establish that Mr. Kent had no other choice but to

resign.[31]

---

[28] *PVNF*, 487 F.3d at 805 (quoting *Tran v. Trs. of State Colleges in Colo.*, 355 F.3d 1263, 1270-71 (10th Cir. 2004)).

[29] *Lara v. Unified Sch. Dist. #501*, 350 Fed. App'x 280, 284 (10th Cir. 2009) (quoting *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1229 (10th Cir. 2001)); *see also PVNF*, 487 F.3d at 805-06 (citing *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004) ("A hostile-environment constructive discharge claim entails something more [than conduct that amounts to actionable harassment]: A plaintiff who advances such a compound claim must show working conditions were so intolerable that a reasonable person would have felt compelled to resign.")))

[30] *See, e.g., DeWalt*, 484 F. Supp. 2d at 1190.

[31] *See Lara*, 350 Fed. App'x at 284 (reaching the same conclusion about isolated remarks about age and general comments about retirement).

Additionally, Mr. Kent contends TIMEC excluded him from certain meetings with Frontier, but there is nothing in the record to indicate whether these were meetings that Mr. Kent normally would have attended or whether the exclusion from the meetings represented a negative event. Mr. Kent also points out that TIMEC informed him at an employee meeting that he would no longer be the site supervisor. Mr. Kent's recollection of events, if true, understandably would be upsetting. But these events do not amount to circumstances in which a reasonable employee in Mr. Kent's position would have no choice but to resign. An employee's working conditions need not be free from all difficulties, unpleasantries, or events that could have been better managed.[32] "It is not enough that a plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world."[33] The issue is whether Mr. Kent had a free choice about whether to end the employment relationship with TIMEC.[34] The evidence, taken in a light most favorable to Mr. Kent, shows that he did have a free choice about whether to resign.

Moreover, the Tenth Circuit and this district have generally required that an employee attempting to establish constructive discharge must demonstrate that he explored options short of resignation or that such options would have been futile.[35] It is unclear which TIMEC employee served as Mr. Kent's direct supervisor after his demotion. Although Mr. Kent testified that he

---

[32] *See DeWalt*, 484 F. Supp. 2d at 1200 (citing *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004).

[33] *Exum*, 389 F.3d at 1135 (quoting *Lee-Crespo v. Schering-Plough Del Caribe, Inc.*, 354 F.3d 31, 45 (1st Cir. 2003)).

[34] *See id.*

[35] *See Yearous v. Niobarra Cnty. Mem' Hosp.*, 128 F.3d 1351, 1357 (10th Cir. 1997); *Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir. 1992); *Haney v. Preston*, No. 08-2658 JAR/GLR, 2010 WL 5392670, at *15 (D. Kan. Dec. 22, 2010); *Beseau v. Fire Dep't No. 1 of Johnson Cnty.*, No. 05-2162, 2006 WL 2795716, at *6 (D. Kan. Sept. 26, 2006); *Lintz v. Am. Gen. Fin., Inc.*, 50 F. Supp. 2d 1074 (D. Kan. 1999).

called Mr. Bolton several times during his vacation, he never actually spoke to Mr. Bolton, and

he never relayed any of his grievances to Mr. Bolton or other managerial-level employees who

might have been in a position to address the situation. There was also some indication—albeit

vague—that those higher up the chain of command than Mr. Daw had conveyed to Mr. Kent that

they expected to move him into a new role—possibly a training position.[36] So, the record does

not reflect that exploring options other than resignation would have been futile.

Mr. Kent has not presented sufficient evidence for a jury to conclude that TIMEC

constructively discharged him. Therefore, the court grants TIMEC's motion for summary

judgment on this claim.

B.      *Claim of Missed Pay Raise Because of Demotion*

TIMEC concedes that there are material issues of fact that preclude summary judgment

on Mr. Kent's discriminatory demotion claim; however, TIMEC seeks a limitation of the

damages Mr. Kent may pursue. Specifically, TIMEC argues that Mr. Kent has sustained no wage

loss as a result of the alleged discriminatory demotion. The parties stipulate that Mr. Kent's

compensation and benefits did not change when TIMEC removed him from the site supervisor

position.[37] But, Mr. Kent contends he would have received a pay raise but for the alleged

demotion.

The evidence shows that prior to Mr. Kent's alleged demotion, both he and his

replacement, Mr. Daw, were making $35 per hour. When TIMEC transferred Mr. Daw to the site

---

[36] *See* Kent Depo. at 87:12-88: (testifying that either Mr. Bolton or Mr. Green had told Mr. Kent not to worry about what he would do next—that they would think of something—and testifying that "Training was mentioned" but that a formal offer was never extended).

[37] *See* Pretrial Order at 3, ECF No. 45.

supervisor position, TIMEC approved a raise for Mr. Daw from $35 per hour to $40 per hour.[38]

Mr. Kent has not pointed to any evidence even suggesting that this raise would have been

available to him either through a set pay-raise schedule or otherwise, or that TIMEC generally

increased the pay rate for the site supervisor position. The record lacks information about why

Mr. Daw received the pay raise. Because Mr. Kent has not come forward with any evidence

suggesting the alleged discriminatory demotion resulted in a missed pay raise he would have

been eligible to receive, the court grants summary judgment in favor of TIMEC on this issue.

Although the court grants TIMEC's motion as to Mr. Kent's alleged wage loss, it does

not dismiss Mr. Kent's discriminatory demotion claim. For one, TIMEC has made clear that it

does not seek summary judgment on the entire claim.[39] Indeed, in a private-sector ADEA suit,

the court may grant relief including "judgments compelling reinstatement, backpay, payment of

wages owed, injunctive relief, declaratory judgment, attorney's fees, and an additional equal

amount as liquidated damages . . . [i]n cases of willful violations[.]"[40] Mr. Kent argues that he

may be entitled to seek nominal damages, attorney fees, and declaratory relief. However, Mr.

Kent does not appear to have preserved in the pretrial order any claim for declaratory relief.[41]

The court will enter a subsequent order setting a status conference to discuss what, if any, other

---

[38] *See* TIMEC Employee Status Change Form at 1, ECF No. 55-10 (reflecting a pay raise given to Richard Daw); *see also* Bradley Harley Bolton Dep. at 170:8-171:8, ECF No. 55-4 (discussing that the Change of Status form reflected a raise given to Richard Daw).

[39] Def.'s Reply to Pl.'s Mem. in Opp'n to Def.'s Mot. for Summary J. at 14, ECF No. 56.

[40] *Villescas v. Abraham*, 311 F.3d 1253, 1257 (10th Cir. 2002) (internal quotations and citations omitted).

[41] *See generally* Pretrial Order, ECF No. 45; *see also Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1267 (10th Cir. 2007) (stating that a pretrial order supercedes the pleadings and controls the subsequent course of litigation); *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived.").

damages or relief Mr. Kent may be entitled to receive.

Accordingly,

**IT IS THEREFORE ORDERED** that defendant's motion for partial summary judgment

(ECF No. 46) is granted.

**IT IS SO ORDERED.**

Dated this 28th day of September, 2012, at Topeka, Kansas.

<u>s/ K. Gary Sebelius</u>
K. Gary Sebelius
U.S. Magistrate Judge